| | | |
|---|---|---|
| THOMAS DUBERVILLE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 13 C 02061 |
| | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| WMG, INC. and KEVIN TUITE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In November 2012, Plaintiff Thomas Duberville was fired from his job as Director of Sales and Marketing for WMG, Inc. Duberville filed this suit against WMG and its President and CEO, Kevin Tuite, alleging violations of the Illinois Wage Payment and Collection Act (IWPCA), 820 ILCS 115/1 *et seq.*, and the Illinois Sales Representative Act (ISRA), 820 ILCS 120/1 *et seq.*, to recover commissions he claims Defendants never paid.[1] R. 5, First Am. Compl. Defendants responded with four counterclaims: breach of the duty of loyalty, fraud, breach of contract, and violation of the Illinois Trade Secrets Act (ITSA), 765 ILCS 1065/1 *et seq.* R. 25, Defs.' Answer and Counterclaims. Defendants now move for summary judgment on both of Duberville's claims and two of their counterclaims: breach of the duty of

---

[1]The Court exercises subject-matter jurisdiction under 28 U.S.C. § 1332 based on the complete diversity of the parties and an amount in controversy exceeding $75,000. Citations to the docket are "R." followed by the entry number and, when necessary, the page/paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "DSOF" (for Defendants' Statement of Facts) [R.68]; "PSOF" (for Duberville's Statement of Facts) [R. 70-3]; Pl.'s Resp. to DSOF (for Duberville's Response to Defendants' Statement of Facts) [R. 70-2]; Defs.' Resp. to PSOF (for Defendants' Response to Duberville's Statement of Facts) [R. 72].

loyalty and breach of contract. R. 65, Defs.' Mot. Summ. J. Duberville opposes summary judgment on his claims and moves for summary judgment against all of Defendants' counterclaims. R. 70, Pl.'s Mot. Summ. J.; R. 70-1, Pl.'s Br. For the reasons explained below, the parties' motions are granted in part and denied in part.

## I. Background

WMG, Inc. is an engineering firm that provides specialized consulting services and computer software to operators of nuclear power plants.[2] R. 68-1, Tuite Aff. ¶ 4. WMG is organized under New York law, and it has been headquartered in Peekskill, New York for more than 30 years. DSOF ¶ 2; Pl.'s Resp. DSOF ¶ 2. Kevin Tuite, a New York resident, is WMG's President and CEO. DSOF ¶ 3. This case arises out of the employment relationship between Thomas Duberville and WMG. Duberville's claims are based on the compensation he believes he is owed under his employment agreements. Defendants' counterclaims are based primarily on Duberville's alleged breaches of loyalty and confidentiality duties when he was an employee of WMG.

---

[2]In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Because each party has moved for summary judgment on some of the claims, the Court will "construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). The factual background of the case is presented with this standard in mind, and all disputed facts will be noted as such.

## A. Duberville's Employment with WMG

Thomas Duberville first worked for WMG as a full-time salesman in 2005, but he resigned within a year. DSOF ¶ 5. In 2009, Duberville again applied for a position at WMG. DSOF ¶ 6. This time, he became the company's full-time Director of Sales and Marketing. DSOF ¶ 7; *see also* R. 70-5, Pl.'s Exh. B, 2009 Employment Offer. In connection with his work at WMG, Duberville signed a confidentiality agreement. DSOF ¶ 9; Pl.'s Resp. DSOF ¶ 9; R. 67-1, Defs.' Exh. F, 2009 Confidentiality and Non-Disclosure Agreement. The agreement, which states that it is governed by New York law, says that Duberville could not, "at any time during or after the course of [his] employment" with WMG, "disclose any Confidential Information to any person, or permit any person to access in any way any Confidential Information that is in [his] possession or control." Defs.' Exh. F, 2009 Confidentiality and Non-Disclosure Agreement at D 00007. The agreement defines "Confidential Information" as any "trade secrets or other information that is proprietary or confidential to WMG or its clients, which may include details regarding business affairs, finances, computer software, business plans, customers, methods of operation and any other data." *Id.* The agreement also contains a noncompete provision. *Id.* at D 00009. Under this provision, Duberville is not allowed to "have any business dealings whatsoever, either directly or indirectly through associates with any customer or client of WMG, any direct competitor of WMG or any person or firm with whom you have made contact in connection with

your employment with, or your performing of consulting services for, WMG" for a period of two years after his employment ended. *Id.*

Duberville also signed an employment agreement in July 2009. Pl.'s Exh. B, 2009 Employment Offer. The agreement promised Duberville an annual base salary of $85,000 and performance-based commissions. *Id.* Under the commission plan, Duberville was to receive five percent of gross sales revenue for all sales that he generated, to be paid as WMG was paid by the customers. *Id.* Duberville was also entitled to a $2,000 draw on future commissions. *Id.* Duberville did not earn any commissions in 2009. DSOF ¶ 19; Pl.'s Resp. DSOF ¶ 19.

The performance-based commission plan continued through September, 2010, when Tuite and WMG's Board of Directors instituted various changes, including a change to Duberville's compensation. R. 67-2, Defs.' Exh. G, Sept. 3, 2010 emails at WMG 013393. On September 2, 2010, Duberville asked Tuite to hold off on any compensation changes until Tuite could explain what Duberville should expect. *Id.* The next day, Tuite responded that the commission system "clearly didn't work[,] and I told you weeks ago we were going to do away with it." *Id.* Although WMG did not have a new commission plan in place and would not have one before the end of the year, "[b]onuses [would] be discretionary like everyone else for the time being." *Id.* Tuite concluded that "the [commission] system wasn't working and wasn't going to." *Id.* Duberville replied that "[i]t's all clear now." *Id.* at WMG 013392.

A few weeks later, in a letter sent to Duberville on September 21, 2010, Tuite reiterated that bonuses were now discretionary, and that there was no new

commission plan. *See* R. 67-2, Defs.' Exh. H, Sept. 21, 2010 Letter. Specifically, the letter said that Duberville's compensation plan was changing, effective September 1, 2010. *Id.* As of that date, Duberville would "no longer be paid per the commission structure as stated in the [2009 employment agreement]." *Id.* Under the modified plan, Duberville would still receive his annual salary, but "all commissions/bonuses will be discretionary until such time that we can agree on a new commission structure that better reflects [Duberville's] efforts." *Id.* The letter included a report of commissions earned through August 31, 2010, and Tuite promised to pay Duberville on all sales that had been invoiced and not yet paid by the customer. *Id.* Tuite also agreed to consider awarding commissions on any sales made by Duberville after August 31, 2010 on a case-by-case basis. *Id.*

In response to the letter, Duberville "ma[de] an appeal" to Tuite on October 1, 2010. R. 67-2, Defs.' Exh. I, Oct. 1, 2010 emails at D 00017. Duberville recognized that "[his] compensation received a significant change" on September 1, 2010 and said that he could not "meet [his] ongoing financial obligations" under the new plan, "even for one additional month." *Id.* He asked Tuite to reconsider the compensation change, proposing two alternative compensation plans. *Id.* Tuite rejected both proposals, but he agreed to "consider some middle ground." *Id.* at D 00016 ("[N]either of your proposals is acceptable."). Tuite reiterated his earlier statement that bonuses would be discretionary for the time being and said that WMG would "not return to the previous system that was unworkable." *Id.* Tuite noted, however, that he expected "commissions earned on outstanding proposals" would cover the

draw on commissions that Duberville had taken. *Id.* He also said that WMG would "pay commission on any proposals closed before the end of the year." *Id.* Recognizing that "times are tough," Tuite expressed that he hoped Duberville would continue to work with WMG, but if Duberville could not continue to work at the new compensation level, Tuite understood. *Id.*

In January, 2011, WMG sent Duberville a new written employment agreement. DSOF ¶ 29; Pl.'s Resp. DSOF ¶ 29. The new agreement raised Duberville's base salary to $105,000 and established a new performance-based commission plan tied to WMG's revenues and earnings before interest and taxes. R. 67-2, Defs.' Exh. K, 2011 Employment Agreement. In response, Duberville calculated what his commissions would be based on the new formula. R. 70-5, Pl.'s Exh. E, Jan. 5, 2011 email. He asked Tuite to "get together in the morning [to] work through" the new proposal. *Id.* He also attached a document that included various "questions and comments" about the proposed employment agreement. *Id.* Duberville never signed the 2011 agreement. PSOF ¶ 19; *see also* Defs.' Resp. PSOF ¶ 19 (objecting to other portions of the statement of fact but not denying that Duberville did not sign the agreement); Defs.' Exh. K, 2011 Employment Agreement (bearing only Tuite's signature).

Duberville's bonus for 2011 was calculated on May 29, 2012. R. 67-2, Defs.' Exh. N, May 29, 2012 email. Tuite determined that the revenue had increased by 133 percent, so the "bonus rate" was 1 percent. *Id.* Based on this formula,

Duberville's 2011 bonus[3] was $17,102.52. *Id.* Because Duberville had received advances and bonuses of $18,865.85 over the course of the year, Tuite calculated that Duberville owed WMG $1,763.33. *Id.* Duberville thanked Tuite for calculating his bonus, expressing disappointment that the improvement in WMG's earnings had not been better. *Id.* He also corrected Tuite's calculations. *Id.* Tuite had mistakenly credited Duberville for $634.15 in expenses that Duberville said should not be charged to the company. *Id.* Incorporating these changes, Duberville determined that he owed WMG $2,397.48. *Id.*

Duberville signed a new employment agreement in January 2012. DSOF ¶ 37; Pl.'s Resp. DSOF ¶ 37; R. 67-2, Defs.' Exh. O, 2012 Employment Agreement. The 2012 agreement raised Duberville's base salary to $115,500 annually and included a performance-based commission program that was also based on WMG's annual increase in revenues and earnings before interest and taxes. Defs.' Exh. O, 2012 Employment Agreement. The 2012 agreement was effective from January 1, 2012 through December 31, 2012. *Id.* But Duberville did not stay at WMG through the end of the year; he was fired on November 15, 2012. R. 67-4, Defs.' Exh. U, Nov. 15, 2012 Termination Letter. WMG provided Duberville a final payment via check, and Duberville agreed that the calculations comprising the check were correct. DSOF ¶ 59; Pl.'s Resp. DSOF ¶ 59.

---

[3]Throughout the email exchanges between Duberville and Tuite, the terms "bonus" and "commission" appear to be used interchangeably. *See*, *e.g.*, Defs.' Exh. N, May 29, 2012 email (using the term "bonus" in the body of the email, but using the term "commission" in the subject line); R. 70-5, Pl.'s Group Exh. F, 2011-2012 emails at WMG 013304 (estimating Duberville's "bonus/commission" at $17,101); Defs.' Exh. H, Sept. 21, 2010 Letter (saying that all "commissions/bonuses will be discretionary" until the parties reached a new agreement).

Throughout his employment with WMG, Duberville was a resident of Chicago, Illinois. DSOF ¶ 1; Pl.'s Resp. DSOF ¶ 1. About six months after Duberville became the Director of Sales and Marketing, WMG rented an office in Chicago. DSOF ¶ 4; Pl.'s Resp. DSOF ¶ 4. WMG claims that this office was temporary and solely for Duberville's use. DSOF ¶ 4. Duberville claims that the Chicago office was not exclusively for his benefit. Pl.'s Resp. DSOF ¶ 4. The parties agree that WMG stopped renting the Chicago office in December 2012, shortly after Duberville was fired. Tuite Aff. ¶ 8; R. 70-5, Pl.'s Exh. C, Duberville Aff. ¶ 9.

### B. Duberville's Alleged Breaches of Loyalty and Confidentiality

Duberville admits that, even when he was working at WMG, he sought out business opportunities for another company, River Technologies, LLC. Pl.'s Resp. DSOF ¶¶ 43-44. River Technologies was founded and run by Duberville's friend, Robert Kozma, and Duberville had worked for River Technologies before becoming the Director of Sales and Marketing at WMG. *Id.* ¶ 39. Although River Technologies was not a competitor of WMG, it was also involved in the nuclear power industry. *Id.*; PSOF ¶ 30; *see also* Defs.' Resp. PSOF ¶ 30 (disputing the statement of fact on other grounds). During the time that Duberville was working for WMG, River Technologies maintained an email account for Duberville, PSOF ¶ 28, and Duberville submitted at least one expense report to River Technologies, DSOF ¶ 49; Pl.'s Resp. DSOF ¶ 49. Defendants also claim that Duberville submitted orders to River Technologies while working at WMG, DSOF ¶ 42, but Duberville denies this claim, Pl.'s Resp. DSOF ¶ 42. Duberville does admit that he would introduce Kozma

to WMG clients "if and when there seemed to be an opportunity for River Technologies with one of [Duberville's] contacts." Pl.'s Resp. DSOF ¶¶ 43-44. Kozma also accompanied Duberville on sales calls to WMG clients. PSOF ¶¶ 32-33. Duberville claims that these introductions were, at least in part, for WMG's benefit. Pl.'s Resp. DSOF ¶¶ 43-44; PSOF ¶ 32.

Defendants also allege that Duberville shared WMG's confidential information with Kozma and River Technologies in violation of the confidentiality agreement. R. 69, Defs.' Br. at 24; DSOF ¶ 47. While working for WMG, Duberville sent an email to one of WMG's clients and carbon-copied Kozma. R. 67-3, Defs.' Exh. P, 2012 emails at WMG 001894A. In that email, Duberville tells the client that "WMG has been refining its Radiological Engineering capabilities," that "a new area that has resulted in interest is WMG's specialty handling tools," and that there has been "an increased interest in [WMG's] MegaShield, Point Kernel shielding software program." *Id.* Duberville attached four of WMG's "one-page info sheets" and an "overview of a recent evaluation that [WMG] did for Susquehanna" to give the client more information on those subjects. *Id.* Duberville goes on to recommend River Technologies to the client, saying "I like these guys a lot and have found them to be reputable with a long and impressive resume." *Id.*

On another occasion, Duberville forwarded Kozma an email exchange between Duberville and a WMG client. *Id.* at WMG 013402-05. In the email to the client, Duberville again recommends River Technologies. *Id.* at WMG 013403-04. In forwarding the email to Kozma, Duberville notes that he "mixed your introduction

9

in with a few of my own agenda items." *Id.* at WMG 013402; *see also id.* at WMG 013403 (stating in the email to the client that "Callaway and Wolf Creek have asked me to supply them with a proposal for training," and asking to follow-up on an earlier "shipping cask discussion"). Duberville swears that he did not reveal any of WMG's confidential information to Kozma. Duberville Aff. ¶¶ 13-15. Kozma also testified that Duberville did not discuss any WMG business in his presence when he accompanied Duberville on sales calls to nuclear power plants. R. 67-4, Defs.' Exh. Q, Kozma Dep. at 76:19-77:9.

When WMG found out about Duberville's relationship with River Technologies, it fired him. Tuite Aff. ¶ 11. After he was fired, Duberville apologized to Tuite if he "in any[ ]way made WMG look bad to the industry." R. 67-4, Defs.' Exh. V, Nov. 15, 2012 Letter. He emphasized that he "was not being paid for what [he] was doing," and that his "goal was to make every effort that[,] if [he] were to be laid off[,] that [he] would find another position." *Id.* Duberville then went to work for Holtec International, Inc., another company that works in the nuclear power industry. DSOF ¶¶ 63-64. At Holtec, Duberville works with Entergy Corporation, a WMG client. *Id.* ¶ 67; *see also* Pl.'s Resp. DSOF ¶ 67. (admitting that Duberville works with Entergy and that "WMG has done business with Entergy").

## II. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard also applies to cross-motions for

summary judgment. *See Int'l Bhd. of Elec. Workers v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing motions for summary judgment, the Court must "constru[e] the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. Analysis

### A. Illinois Sales Representative Act

Duberville concedes that the Illinois Sales Representative Act does not apply to him. Pl.'s Br. at 6. The ISRA is a corollary to the Illinois Wage Payment and Collection Act. *See English Co. v. Northwest Envirocon, Inc.*, 663 N.E.2d 448, 453 (Ill. App. Ct. 1996). By its terms, the statute does not cover "one who qualifies as an employee of the principal pursuant to the Illinois Wage Payment and Collection Act." 820 ILCS 120/1(4). Because the parties agree that Duberville was an employee of WMG under the IWPCA, the ISRA does not apply. Duberville's ISRA claim is therefore dismissed.

## B. Illinois Wage Payment Collection Act

The Illinois Wage Payment Collection Act "provide[s] employees with a cause of action for the timely and complete payment of earned wages or final compensation." *Majmudar v. House of Spices (India), Inc.*, 1 N.E.3d 1207, 1210 (Ill. App. Ct. 2013). For the purposes of the IWPCA, "final compensation" due to separated employees includes "earned commissions." 820 ILCS 115/2. Duberville claims that WMG and Tuite violated the IWPCA by failing to pay Duberville the commissions that he earned under the 2009 Employment Agreement and the 2012 Employment Agreement. First Am. Compl. ¶¶ 12-22. As a threshold matter, Defendants argue that the IWPCA does not even apply to them because they are not Illinois employers. Defs.' Br. at 20.

The IWPCA "applies to all employers and employees *in this State*," but it does not clarify what makes an employer "in this State" for the purposes of the Act. 820 ILCS 115/1 (emphasis added); *see also* 820 ILCS 115/2 (defining "employer" without reference to the employer's location). Courts that have considered the issue have held, without laying out a bright-line test, that the IWPCA "applies only to Illinois employees and Illinois employers." *Khan v. Van Remmen, Inc.*, 756 N.E.2d 902, 912-13 (Ill. App. Ct. 2001); *see also, e.g.*, *Glass v. Kemper Corp.*, 920 F. Supp. 928, 930-34 (N.D. Ill. 1996), *aff'd* 133 F.3d 999 (7th Cir. 1998); *Lovelady v. Lyris, Inc.*, No. 13 C 4065, 2013 WL 5967522, at *5-6 (N.D. Ill. Nov. 7, 2013); *Nathan v. Morgan Stanley Renewable Dev. Fund, LLC*, No. 11 C 2231, 2012 WL 1886440, at *17 (N.D. Ill. May 22, 2012); *Maxwell v. Vertical Networks, Inc.*, No. 03 C 5715, 2005 WL 950634, at

*9-10 (N.D. Ill. Mar. 18, 2005). In coming to this conclusion, the Appellate Court of Illinois cautioned that it "[did] not purport to create an all-encompassing definition of 'employers in this State' for purposes of the Wage Act." *Khan*, 756 N.E.2d at 913. Illinois courts have therefore "left open the possibility that a corporation with no headquarters or physical presence in Illinois can still qualify as an 'employer' under the Wage Act." *Elsener v. Brown*, 996 N.E.2d 84, 99 (Ill. App. Ct. 2013); *see also Musso v. Excellence in Motivation, Inc.*, No. 10 C 3236, 2010 WL 3385452, at *2 (N.D. Ill. Aug. 24, 2010) (noting that *Khan* "expressly left open the possibility that on a different set of facts, a foreign corporation *could* be considered an Illinois employer").

Since the issuance of the *Khan* decision, several district courts have considered when an employer organized and headquartered in a different state can nonetheless be an Illinois employer under the IWPCA. Courts that have allowed IWPCA claims to proceed have typically required "allegations of substantial in-state activity" to find that an employer based in another state qualifies as an Illinois employer. *Nathan*, 2012 WL 1886440, at *17 (citing *Musso*, 2010 WL 3385452, at *1-2; *McGreal v. Semke*, 836 F. Supp. 2d 735, 740-41 (N.D. Ill. 2011)). In *McGreal v. Semke*, a Missouri corporation with its principal place of business in Missouri argued that it was not an Illinois employer under the IWPCA. 836 F. Supp. 2d at 740. The court refused to grant the corporation's motion to dismiss, however, because the defendant "maintains an office in Illinois, markets its services in Illinois, and conducts substantial business in the state." *Id.* at 740-41. The court in

*Musso v. Excellence in Motivation, Inc.* similarly refused to grant an out-of-state corporation's motion to dismiss because the corporation "not only conducts substantial business in Illinois, but also maintains offices and a registered agent in the state." 2010 WL 3385452, at *2.

Unlike the plaintiffs in *McGreal* and *Musso*, however, Duberville has failed to show that WMG engaged in sufficient activity in Illinois to convert it (and, by extension, Tuite) into an Illinois employer for the purposes of the IWPCA. The parties agree that WMG rented an office in Chicago from December 2009 through December 2012. DSOF ¶ 4; Pl.'s Resp. DSOF ¶ 4. Defendants argue that this temporary Chicago office rented for Duberville's benefit is not sufficient to make them Illinois employers under IWPCA. DSOF ¶ 4; Defs.' Br. at 20. In response, Duberville denies that the office was temporary and solely for his benefit, Pl.'s Resp. DSOF ¶ 4, and argues that "WMG does business in multiple states including Illinois." PSOF ¶ 1. These bare assertions, however, are unsupported by any specific facts tending to show substantial in-state activity.

In support of his claim that the Chicago office was not temporary or solely for his benefit, Duberville cites to his own affidavit. Pl.'s Resp. DSOF ¶ 4 (citing Duberville Aff. ¶¶ 8-9). Of course, it is perfectly acceptable at the summary judgment stage for a party to present facts in his own affidavit, s*ee* Fed. R. Civ. P. 56(c), but Duberville's affidavit does not provide sufficient factual support for his statement that the office was not temporary or solely for his benefit. The cited portion of the affidavit says that Duberville did not commute weekly to Peekskill,

New York before WMG rented the Chicago office and that WMG "rented and maintained a physical office with a phone in Chicago for three years, from approximately December of 2009 until December of 2012." Duberville Aff. ¶¶ 8-9. These statements do nothing to illuminate *why* Duberville believes the office was not temporary or solely for his benefit; they simply reiterate the agreed fact that WMG rented a Chicago office for three years.

But even if Duberville had sworn in his affidavit that the Chicago office was permanent or not solely for his benefit, it would not have been enough. An affidavit must set forth *specific facts* showing that there is a genuine issue for trial. *See Payne v. Pauley*, 337 F.3d 767, 772-73 (7th Cir. 2003). A general statement that the office was not solely for Duberville's benefit, without more, would not be sufficient to show that WMG had substantial in-state activity. Had Duberville sworn that there were additional employees in the Chicago office or that another employee replaced him in the Chicago office after he was fired—specific facts that would shed light on *why* he believes the Chicago office was not temporary or solely for his benefit—he might have created a genuine issue of fact.[4]

In support of his statement that "WMG does business in multiple states including Illinois," Duberville cites to his own deposition, the 2009 employment agreement, and Tuite's affidavit.[5] PSOF ¶ 1. The citations to Duberville's deposition

---

[4]Notably, Duberville does not suggest that there is a genuine issue of fact. Instead, he argues that "[t]here can be no question that Defendant, WMG[,] is an Illinois employer under the IWCPA." Pl.'s Br. at 10.

[5]Duberville also notes in his brief that WMG does business with nuclear power plants in Illinois, Pl.'s Br. at 12, but this statement lacks a citation and appears to be unsupported by any record evidence.

actually do not reflect testimony that is relevant to WMG's presence in Illinois, *see* R. 70-5, Pl.'s Exh. A, Duberville Dep. at 52:2-18, and the Court cannot find any other portions in the included excerpts of the deposition transcript to support the statement of fact. The 2009 employment agreement does mention the Chicago office. Under the agreement, WMG was to "set up a satellite office in the Chicago area to serve as the base of operations for the sales director" once a sales threshold of $200,000 was exceeded. Pl.'s Exh. B, 2009 Employment Offer. Tuite's affidavit similarly states that "WMG rented a small temporary office in Chicago for Duberville's use[.] As soon as Duberville was terminated in November, 2012, WMG ended its lease on the temporary office." Tuite Aff. ¶ 8. Again, all that this record evidence does is reinforce the undisputed fact that WMG rented an office in Chicago for Duberville's use from December 2009 to December 2012. Duberville does not cite to any parts of the record that identify any clients in Illinois, any marketing in Illinois, any licenses to do business in Illinois, or any details whatsoever that support his statement that WMG "does business in" Illinois beyond just the single office rental, let alone the substantial business that the case law demands before categorizing an employer as an *Illinois* employer.

Thus, the statements of fact that actually are supported by the record show only that WMG paid rent for the Chicago office from 2009 to 2012, maintained a phone in the Chicago office, and ended the lease on the Chicago office after Duberville was fired. Renting a single office for a single employee that was closed when the employee was fired is not sufficiently substantial in-state activity to

subject WMG to the IWPCA.[6] *See Lovelady*, 2013 WL 5967522, at *5-6 (dismissing an IWPCA claim against a Delaware corporation that was headquartered in California even though the corporation allowed the plaintiff to conduct his work from Illinois); *Nathan*, 2012 WL 1886440, at *18 (dismissing an IWPCA claim against a Delaware LLC with its principal place of business in Florida even though the LLC maintained an office in Illinois to accommodate the plaintiff and continued to employ an employee in Illinois at the time of the suit). There is nothing to suggest that WMG had any other employees in Illinois, did any other business in Illinois, or had more significant employment activity in the state. *Cf. McGreal*, 836 F. Supp. 2d at 740-41 (describing an employer that "maintain[ed] an office in Illinois, market[ed] its services in Illinois, and conduct[ed] substantial business in the state"); *Musso*, 2010 WL 3385452, at *1 (describing an employer that "not only conducts substantial business in Illinois, but also maintains offices and a registered agent in the state"). WMG is therefore not an Illinois employer for purposes of the IWPCA, and Defendants are not subject to the IWPCA. WMG's motion for summary judgment on Duberville's IWPCA claim is granted.[7]

## C. Duberville's Breach of Contract Claim

Alternatively, Duberville argues that he has adequately pled a breach of contract claim and should be able to proceed on that basis. Duberville is right that

---

[6]This is not to suggest, however, that the IWPCA does not apply because the Chicago office was solely for *Duberville*'s benefit; a plaintiff's employment should count as much any other employee's activity in Illinois. But in this case, the in-state activity is not sufficiently substantial to support application of the IWPCA because the Chicago office was for a single employee in a remote location.

[7]Because the IWPCA does not apply, the Court need not address the parties' remaining arguments concerning the IWPCA claim.

"[e]ven citing the wrong statute needn't be a fatal mistake, provided the error is corrected in response to the defendant's motion for summary judgment and the defendant is not harmed by the delay in correction." *Hatmaker v. Memorial Medical Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010). Because the IWPCA claim is materially similar to a breach of contract claim, Defendants were on notice of the contours of Duberville's claim and would not be prejudiced by the correction.[8] Obviously, it would have been better for Duberville to have explicitly asserted a breach of contract claim right from the start of the case. But the IWPCA claim (which he did allege from the start) really is just, in this case, a statutory form of the breach of contract claim. The parties in effect have litigated the contract claim; they just have done so with the overlay of the IWPCA. In light of the overlap, WMG will suffer no undue litigation disadvantage by allowing the breach of contract claim to stand alone, and Duberville will therefore be allowed to proceed on the breach of contract claim.

In this new breach of contract claim, Duberville argues that he was not paid all of the commissions that he was owed under the 2009 employment agreement. Pl.'s Br. at 6. The parties agree that WMG stopped paying Duberville under the 2009 agreement's five-percent commission plan in September 2010, but Defendants argue that the contract was modified and therefore no longer effective after that

---

[8]Defendants' argument that Duberville has not pled all of the elements of the contract claim fails. *See* Defs.' Resp. Br. at 6-7. The parties agree that the 2009 employment agreement was a valid and enforceable contract, s*ee, e.g.,* Defs.' Br. at 2 (describing the 2009 employment agreement as a contract); Tuite Aff. ¶ 7 (same), and the facts alleged in support of the IWPCA claim and against the counterclaims are sufficient allegations that Duberville performed under that contract.

date. Defs.' Resp. Br. at 7-10. Defendants have moved for summary judgment on these grounds. Duberville responds that there is a genuine issue of fact as to whether the 2009 agreement was effectively modified, precluding summary judgment on this issue.

The parties agree that Duberville was an at-will employee of WMG. *See* DSOF ¶ 8; Pl.'s Resp. DSOF ¶ 8. Although contracts ordinarily may not be modified unilaterally, under Illinois law,[9] an at-will employment agreement "may be modified by the employer as a condition of its continuance." *Geary v. Telular Corp.*, 793 N.E.2d 128, 131 (Ill. App. Ct. 2003). The employer's right to unilaterally modify the agreement extends to compensation terms like commission plans. *Id.* If the at-will employee "continues to work after a change in commission plan, he is deemed to have accepted the change." *Id.* (citing *Schoppert v. CCTC Int'l, Inc.*, 972 F. Supp. 444 (N.D. Ill. 1997)). This is true even if the employee's continued performance is "grudging and protest-filled." *Id.* at 132.

Defendants argue that the 2009 employment agreement was unilaterally modified on September 3, 2010, when Tuite sent Duberville an email telling him that the commission plan "clearly didn't work" and that "[b]onuses [would] be discretionary like everyone else for the time being." Defs.' Exh. G, Sept. 3, 2010 emails at WMG 013392-93. WMG reiterated the changes in the commission plan a

---

[9]Both parties assume that Illinois law would apply to the contract dispute. *See* Pl.'s Br. at 5-10 (citing only cases applying Illinois law in discussing the breach of contract claim); R. 71, Defs.' Resp. Br. at 7-10 (same); R. 75, Pl.'s Reply Br. at 7-10 (same). The Court will therefore apply Illinois law. *Gould v. Artisoft, Inc.*, 1 F.3d 544, 548 n.7 (7th Cir. 1993) ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, [the Court] will apply the law of the forum state.").

few weeks later, when it told Duberville that he would "no longer be paid per the commission structure as stated in the [2009 employment agreement]," and that "all commissions/bonuses will be discretionary until such time that we can agree on a new commission structure that better reflects [Duberville's] efforts." Defs.' Exh. H, Sept. 21, 2010 Letter. Although Duberville responded with appeals for reconsideration and new proposals, the proposals were rejected by Tuite, and yet Duberville continued to work for WMG. Defendants argue, therefore, that Duberville accepted WMG's unilateral modification of the commission term by his continued performance.

Duberville responds that there is a genuine issue of fact as to his acceptance of the modified terms. Citing to various emails between himself and Tuite, Duberville argues that he rejected the modification by continuing to negotiate with WMG over the terms of his employment agreement. Pl.'s Br. at 8-10. In support of this argument, Duberville cites to *Schoppert v. CCTC International, Inc.*, in which the court denied summary judgment for the employer because the facts surrounding a unilateral modification of an at-will contract did not "clearly indicate either acceptance or rejection." 972 F. Supp. at 449. In fact, however, *Schoppert* evaluated two unilateral modifications to the employee's compensation terms, and one was deemed to have effectuated a change, but the second did not. In the first modification, the employee complained about the change. *Id.* at 445. In response to the objection, the employer "made it plain" that the consideration for the new compensation agreement was the employee's continued employment by telling him

"[w]ell, that's the plan." *Id.* at 445, 447. Although the employee "objected continually," he continued to work for the employer for over two more years. *Id.* at 447. He never told the employer that he would only work under the pre-modification conditions or that his continued performance was conditioned on the earlier commission structure. *Id.* On these facts, the court held that the employee had accepted the unilateral modification. *Id.*; *see also Geary*, 793 N.E.2d at 131-32 (citing *Schoppert*).

The second modification was "more complex." *Schoppert*, 972 F. Supp. at 449. In proposing the compensation change, the employer "sought [the employee's] signature as evidence of acceptance." *Id.* The modification also added a new substantive term: the employee was required to sign a noncompete agreement. *Id.* He never signed either the modified contract or the noncompete agreement. *Id.* The court held that the employer should have interpreted the employee's refusal to sign the agreements as a rejection of the modification. *Id.* Furthermore, the employer continued to pay the employee under the *previous* contract for several months and repeatedly asked him to sign the new agreements. *Id.* Viewing these facts in the light most favorable to the employee, the court denied summary judgment for the employer. *Id.*

Here, the facts in the record show that the September 2010 modification was more like the first modification in *Schoppert* rather than the second. Like the employer in *Schoppert* saying "that's the plan" in the face of the employee's objections, Tuite made clear to Duberville that the modification was going forward.

*See* Defs.' Exh. G, Sept. 3, 2010 emails at WMG 013393 ("[T]he system clearly didn't work and I told you weeks ago we were going to do away with it .... Bonuses will be discretionary like everyone else for the time being."); Defs.' Exh. H, Sept. 21, 2010 Letter ("[Y]ou will no longer be paid per the commission structure as stated in the referenced agreement above."). WMG's reinforced its position in response to Duberville's alternate proposals. Defs.' Exh. I, Oct. 1, 2010 emails ("[N]either of your proposals is acceptable. We will not return to the previous system."). Tuite also recognized that Duberville's continued performance could be consideration for the modification, saying that he understood if Duberville could not continue his employment at the new compensation level. *Id.*

Unlike the plaintiff in *Schoppert*, Duberville has not raised facts, even when viewed in the light most favorable to him, to support the inference that he rejected this proposal. The 2010 modification did not require Duberville's signature or otherwise require his approval. WMG agreed to consider commissionable items on a case-by-case basis, but did not continue to pay Duberville under the 2009 agreement. And although Duberville appealed the change in his compensation plan, he acknowledged that the change had been made. Defs.' Exh. I, Oct. 1, 2010 emails at D 00017 ("[A]s of September 1, my compensation received a significant change."). A unilateral modification to an at-will employment contract is accepted by performance, even if that performance is grudging and protest-filled. *See Geary,* 793 N.E.2d at 131. Duberville did protest and did ask WMG to reconsider the change in

compensation,[10] but without more, that is not enough to create a genuine issue of fact as to his acceptance of the contract modification.

Although the undisputed evidence in the record shows that Duberville accepted the 2010 modification,[11] he has nevertheless presented a question of fact on a limited aspect of the terms of that agreement. Specifically, in the September 21, 2010 letter setting out the terms of the new compensation plan, Tuite promised to pay all commissions earned as of August 31, 2010 and to consider on a case-by-case basis any commissionable work "that bears fruit after August 31, 2010." Defs.' Exh. H, Sept. 21, 2010 Letter. Then, in his email to Duberville on October 1, 2010, Tuite told Duberville that WMG "will pay commission on any proposals closed before the end of the year." Defs.' Exh. I, Oct. 1, 2010 emails at D 00016. Drawing all inferences from this evidence in favor of Duberville, a reasonable trier of fact could conclude that WMG promised, as part of the modification, to pay Duberville all commissions earned through the end of 2010 under the previous sales-based commission system. Defendants' motion for summary judgment on Duberville's

[10]Duberville argues that he did not accept the 2011 modification to his employment agreement because he did not sign the document and continued to negotiate with WMG. Pl.'s Br. at 8. Because the Court concludes that Duberville accepted the 2010 modification, however, any question of fact as to his acceptance of the 2011 agreement is irrelevant. If Duberville *did* accept the 2011 agreement, he would have been owed a commission based on WMG's earnings before interest and taxes, which he received. *See* Defs.' Exh. N, May 29, 2012 email. If he did *not* accept the 2011 agreement, his 2011 commission would have been *entirely* discretionary under the 2010 modification (which, for 2011, would be worse for Duberville than the earnings-based formula).

[11]There may be a question of fact as to *when* the 2010 modification took place, as unilateral modifications to at-will employment agreements may not be retroactive. *See Geary*, 793 N.E.2d at 132; *Baker v. Internap Network Servs. Corp.*, No. 09 C 875, 2010 WL 3834003, at *4 (N.D. Ill. Sept. 23, 2010). Given the Court's conclusion that Duberville has demonstrated that there is a genuine issue of fact surrounding commissions earned in the final months of 2010, however, it is not necessary to evaluate when the 2010 modification occurred.

breach of contract claim is therefore denied with regard to the claim for commissions earned between September and December 2010.

Duberville's complaint also alleges that he was not paid all of the commissions that he was owed under the 2012 employment agreement. First Am. Compl. ¶ 12. It is not clear, however, whether Duberville intended to allege the breach of contract claim for the 2012 agreement in his response to the motion for summary judgment. *See* Pl.'s Br. at 6 ("Plaintiff is also allowed to bring a breach of contract action for any commissions allegedly due."); *id.* at 10 (discussing a question of fact surrounding the 2012 contract in the section titled "Plaintiff Has Stated A Claim Under IWPCA And Breach of Contract"); *but see* Pl.'s Br. at 6 (arguing that "[t]he Plaintiff was not paid his bonus or commission due under the original employment agreement signed in 2009" without discussing the 2012 contract); R. 75, Pl.'s Reply Br. at 8 (stating that "[t]he parties had a valid and enforceable employment contract dated July 19, 2009" without mentioning the 2012 contract). Defendants seem to assume that Duberville was only asserting a breach of contract claim for the 2009 agreement, and they responded based on that assumption. *See* Defs.' Resp. Br. at 7 ("Plaintiff argues for the first time that the 2009 Employment Agreement was breached and that it was never modified in 2010 or subsequently replaced by the 2011 Employment Agreement."). Despite this uncertainty, the Court is inclined to allow Duberville to bring a claim for breach of contract for the 2012 agreement, given the liberal amendment standards of Rule 15(a)(2). *See* Fed. R. Civ. P. 15(a)(2). Defendants would not be prejudiced by this amendment; as discussed

above, the breach of contract claim closely parallels the earlier IWPCA claim, which clearly included an allegation that commissions were owed on the 2012 contract. *See* Defs.' Br. at 17-20.

The parallels between the IWPCA and breach of contract also pose a problem for Duberville, however. In their motion for summary judgment, Defendants argue that it did not owe Duberville the 2012 commissions under IWPCA because they were not "earned" at the time of his termination. *Id.* (citing *McLaughlin v. Sternberg Lanterns, Inc.*, 917 N.E.2d 1065, 1069-72 (Ill. App. Ct. 2009)). This argument, although premised on the IWPCA's statutory language, also raises questions under Illinois common law. *See Colosi v. Electri-Flex Co.*, 965 F.2d 500, 504 (7th Cir. 1992) (applying Illinois law and noting that "[e]mployment at will is a contractual relationship, one which entitles the employee to all wages and other benefits that he has earned, *i.e.*, that accrued before he was terminated"). Duberville did not address this argument in his response. He therefore failed to explain why he is entitled to the 2012 bonuses, which were based on the *annual* change in WMG's earnings before interest and taxes, even though he was fired *before* the end of the year. Arguments not raised in response to the moving party's motion for summary judgment are waived. *Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014); *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 876 (7th Cir. 2008) (holding that an underdeveloped argument is waived). Defendants' motion for summary judgment as to commissions earned in 2012 is therefore granted.

Duberville may move to reconsider this decision if he is able to overcome the normal hurdles of a motion for reconsideration. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (stating that a court should only revisit prior decisions "where the initial decision was clearly erroneous and would work a manifest injustice") (internal quotation marks and citation omitted). Moreover, if Duberville does move to reconsider, he must include a fully developed argument explaining why he is entitled to the annual bonus in the 2012 contract under Illinois common law.

For the reasons discussed above, Defendants' motion for summary judgment on Duberville's breach of contract claim is granted in part and denied in part. It is granted for all commissions earned after 2010, but there remains a genuine issue of material fact as to whether Duberville is owed commissions that he earned between September 2010 and December 2010. Defendants' motion is therefore denied for claims concerning commissions earned during that period.

### D. Breach of the Duty of Loyalty

Under Illinois law, employees owe a duty of loyalty to their employer.[12] *Lawlor v. North American Corp. of* Illinois, 983 N.E.2d 414, 433 (Ill. 2012). An employee breaches this duty "when he takes advantage of knowledge and/or property acquired in the employer's business to make a profit for [himself] at the employer's expense." *Ladenberger v. Gen. Signal Pump Grp./Aurora Pump*, No. 00 C 4054, 2001 WL 709488, at *5 (N.D. Ill. June 22, 2001) (citing *Beaton & Assocs.,*

[12]Again, the parties have assumed that Illinois law applies to the duty of loyalty claim by citing exclusively to Illinois case law on the issue. *See* Defs.' Br. at 21-23; Pl.'s Br. at 12-13. The Court will therefore apply Illinois law. *See Gould*, 1 F.3d at 548 n.7.

*Ltd. v. Joslyn Mfg. & Supply Co.*, 512 N.E.2d 1286, 1290-91 (Ill. App. Ct. 1987), *superseded by statute on other grounds*). To state a claim for breach of fiduciary duty, Defendants must also show that the employee's breach of his duty of loyalty proximately caused an injury to the employer. *Lawlor*, 983 N.E.2d at 433.

Defendants claim that Duberville breached his duty of loyalty to WMG by soliciting business opportunities for River Technologies while working for WMG. Because the parties do not dispute that Duberville made connections between WMG clients and River Technologies without WMG's knowledge or consent, *see* DSOF ¶¶ 43-44; Pl.'s Resp. DSOF ¶¶ 43-44, Defendants argue that they are entitled to summary judgment, Defs.' Br. at 23. Duberville also moves for summary judgment on this claim. He argues that Defendants cannot show that they suffered any injury because of Duberville's actions, and therefore cannot prove a claim for breach of the duty of loyalty. Pl.'s Br. at 12-13. In support of this argument, Duberville notes that River Technologies, although also in the nuclear power industry, is not a competitor of WMG. PSOF ¶ 30; *see also* Defs.' Resp. PSOF ¶ 30 (denying the statement of fact without controverting that River Technologies is not WMG's competitor). By connecting WMG clients with River Technologies, Duberville claims that he was attempting to build relationships and goodwill for WMG. Duberville Aff. ¶ 18. The founder and Chief Operating Officer of River Technologies also testified that he referred clients to WMG based on Duberville's relationship-building. R. 70-5, Pl.'s Exh. G, Kozma Dep. at 37:4-22. Because each motion for summary judgment must

be resolved by taking all reasonable inferences in favor of the nonmoving party, *see O'Regan*, 246 F.3d at 983, the Court will address each party's motion in turn.

Although it is a very close call, Defendants' motion for summary judgment on the duty of loyalty counterclaim must be denied. Duberville is correct that Defendants must prove that they suffered an injury because of Duberville's breach of loyalty, *see Lawlor*, 983 N.E.2d at 433, and Duberville has shown that there is a genuine issue of material fact as to the harm suffered by WMG.[13] Duberville swears that his dealings with River Technologies were meant to help WMG by building relationships within the industry and promoting good will. Duberville Aff. ¶ 18. His testimony is bolstered by that of Robert Kozma (River Technologies' COO), who claims that he sent clients to WMG based on his relationship with Duberville. Pl.'s Exh. G, Kozma Dep. at 37:4-22. Drawing all reasonable inferences in Duberville's favor, it is possible to conclude that WMG gained business because of Duberville's relationship with River Technologies and was therefore not harmed by Duberville's conduct. Although a trier of fact might not ultimately find this evidence convincing in the face of the significant evidence that Duberville promoted River Technologies throughout his time at WMG without WMG's knowledge or consent, the Court cannot weigh conflicting evidence at the summary judgment stage. *See Anderson*, 477 U.S. at 249. Because there is a genuine issue of fact surrounding the injury

---

[13]Because there is a genuine dispute over whether Defendants suffered an injury, the Court does not need to decide whether Defendants have established the other elements of the breach of duty claim.

suffered by WMG, Defendants' motion for summary judgment on its duty of loyalty counterclaim is denied.[14]

Duberville's counter-motion for summary judgment on this loyalty-breach claim, on the other hand, is easily denied. A reasonable factfinder could conclude, based on the significant evidence that Duberville was using WMG resources to solicit clients for River Technologies, that WMG suffered harm. Duberville was making sales pitches for River Technologies in client emails, Defs.' Exh. P, 2012 emails at WMG 001894A, WMG 013402-05, and he was taking the COO of River Technologies on *WMG* client visits, DSOF ¶¶ 48, 51-52, all without WMG's knowledge. Drawing all reasonable inferences in WMG's favor, it is readily possible to conclude that these actions harmed WMG's client relationships, goodwill in the industry, and reputation. More concretely, Defendants put forth evidence that Duberville used WMG's time and resources to generate leads for River Technologies. *See, e.g.,* DSOF ¶ 55 (stating that Duberville submitted expense reports that included expenses from a marketing trip with Kozma); *but see* Pl.'s Resp. DSOF ¶ 55 (stating that, because Kozma paid for transportation, WMG actually saved costs). Because a reasonable trier of fact could conclude that WMG was harmed by Duberville's dealings with River Technologies and Kozma, Duberville's motion for summary judgment on Defendants' breach of loyalty claim is denied.

---

[14]Because there is a genuine issue of material fact as to the elements of the duty of loyalty claim, the Court does not need to reach Defendants' argument that Duberville has forfeited his compensation.

## E. Fraud

Duberville argues that because Defendants' fraud counterclaim "is based upon the same set of alleged actions" as their breach of the duty of loyalty counterclaim, summary judgment should be granted on the same grounds. Pl.'s Br. at 12-13. As discussed above, there is a genuine dispute of material fact as to whether Duberville's contact with River Technologies, LLC was harmful to Defendants. Duberville's motion for summary judgment on the fraud counterclaim is denied.

## F. Defendants' Breach of Contract Claim

In their counterclaim for breach of contract, Defendants allege that Duberville breached both the nondisclosure and the noncompete portions of his confidentiality agreement. Defs.' Br. at 24-25. They argue that undisputed facts in the record show that Duberville breached the nondisclosure provision by sharing confidential information with River Technologies and breached the noncompete provision by working for Holtec, a competitor, shortly after he was fired by WMG. *Id.* Defendants have moved for summary judgment on this claim. Duberville has also moved for summary judgment, claiming the contract is invalid and unenforceable for two reasons: (1) it was not supported by consideration; and (2) the noncompete provision is an unreasonable restraint of trade. Pl.'s Br. at 15-19. Because Duberville's first argument affects both provisions of the confidentiality agreement, the Court will address it first. The remaining issues for each provision are then discussed in turn.

Duberville signed the confidentiality agreement on July 16, 2009, a few days before he signed the 2009 employment agreement. *See* Pl.'s Exh. B, 2009 Confidentiality and Non-Disclosure Agreement; Defs.' Exh. C, 2009 Employment Offer (signed July 20, 2009). Because of this brief gap, Duberville argues that he did not receive any consideration for signing the confidentiality agreement. Pl.'s Br. at 15-16. Of course, Duberville is right that a contract unsupported by consideration is not enforceable, but the undisputed facts in the record show that the confidentiality agreement was a condition of Duberville's employment. The agreement frequently references Duberville's employment with WMG; in fact, *every single* substantive provision of the contract mentions the signatory's employment at WMG. Defs.' Exh. F, 2009 Confidentiality and Non-Disclosure Agreement (discussing employment in every provision except the enforceability, choice-of-law, and integration provisions). No reasonable finder of fact could conclude that a four-day gap between the signing of these agreements supports the conclusion that they were wholly separate contracts. The contracts were signed roughly contemporaneously and the confidentiality agreement referenced and relied upon Duberville's employment with WMG. The confidentiality agreement therefore did not require separate consideration; it was a condition of Duberville's employment. Duberville's argument that the contract was unenforceable therefore fails.

## 1. Nondisclosure Provision

Defendants claim that Duberville breached the nondisclosure provision of the agreement by sharing confidential information with Kozma and River

Technologies. Under the agreement, Duberville is prohibited from disclosing any confidential information during or after his employment with WMG. Defs.' Exh. F, 2009 Confidentiality and Non-Disclosure Agreement. The agreement says that confidential information "may include details regarding business affairs, finances, computer software, business plans, customers, methods of operation and any other data." *Id.*

Looking to emails between Duberville and WMG's clients that were also sent to Kozma, Defendants argue that the undisputed facts in the record show that Duberville disclosed confidential information in violation of the agreement. *See* DSOF ¶ 47; Defs.' Br. at 24-25. The emails sent to Kozma do contain information about WMG. In one email, Duberville tells the client that "WMG has been refining its Radiological Engineering capabilities," that "a new area that has resulted in interest is WMG's specialty handling tools," and that there has been "an increased interest in [WMG's] MegaShield, Point Kernel shielding software program." Defs.' Exh. P, 2012 emails at WMG 001894A. Duberville also attached four of WMG's "one-page info sheets" and an "overview of a recent evaluation that [WMG] did for Susquehanna" to give the client more information on those subject. *Id.* In another, Duberville tells the client that "Callaway and Wolf Creek have asked me to supply them with a proposal for training," and he asks the client to follow-up on an earlier "shipping cask discussion." *Id.* at WMG 013403.

Additional facts presented by Duberville, however, show that summary judgment must be denied. For one, Duberville swears that he did not reveal any

confidential information to River Technologies or Kozma. Duberville Aff. ¶¶ 13-15, 19-24. Kozma also testified that Duberville did not discuss WMG business in his presence. Pl.'s Exh. G, Kozma Dep. at 76:19-77:9. Turning to the emails cited by Defendants, Duberville argues that the information in them is not confidential. *See* Pl.'s Resp. DSOF ¶ 47 (stating that the brochures attached to the email were sales brochures offered to the general public). Although confidential information may include "details regarding business affairs" or "customers," information of that nature is not *necessarily* confidential. Without more information about the WMG business discussed in the emails sent to Kozma, a reasonable trier of fact could, based on Duberville's testimony, conclude that the information was not confidential. Again, the trier of fact might very well not ultimately find this evidence persuasive, but the Court may not weigh the evidence at the summary judgment stage. *See Anderson*, 477 U.S. at 249. Defendants' motion for summary judgment for breach of the nondisclosure provision of the agreement is denied.

### 2. Noncompete Provision

Defendants also argue that Duberville breached the noncompete provision of the confidentiality agreement by working for a competitor and having business dealings with a WMG client within two years of being fired from WMG. Defs.' Br. at 24. Duberville does not dispute that he is working for Holtec or with Entergy, a WMG client, *see* Pl.'s Resp. DSOF ¶¶ 63, 67, but he argues that he is entitled to summary judgment because the noncompete provision of the confidentiality agreement is overbroad and an unreasonable restraint on trade. Pl.'s Br. at 16-19.

Because finding in Duberville's favor would invalidate the noncompete provision, the Court will address Duberville's argument first.

Before analyzing the enforceability of the covenant not to compete in the confidentiality agreement, the Court must determine which state's law applies to the contract. In a diversity case, the Court applies the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Where, as here, the contract includes a choice-of-law clause, Illinois law will respect that provision unless "(1) the chosen state has no substantial relationship to the parties or the transaction; or (2) application of the chosen law would be contrary to a fundamental public policy of a state with a materially greater interest in the issue in dispute." *Brown and Brown, Inc. v. Mudron*, 887 N.E.2d 437, 439-40 (Ill. App. Ct. 2008).

Duberville argues that the contract should be interpreted under Illinois law, though he does not explain precisely why. Pl.'s Br. at 18. He argues that Duberville worked in Chicago while he was employed by WMG, *id.*, but that is not sufficient to disregard the choice-of-law provision. WMG is a New York corporation with its principal place of business in New York; New York's relationship to the parties and transaction is therefore sufficiently substantial. *See Hall v. Sprint Spectrum L.P.*, 876 N.E.2d 1036, 1041 (Ill. App. Ct. 2007) (concluding that Kansas had a substantial relationship to the parties or transaction because the defendant was a Kansas corporation with its principal place of business in Kansas). Duberville does not point to any fundamental public policy of Illinois that would justify ignoring the

choice-of-law provision, Pl.'s Br. at 18, nor does there appear to be one. Both New York and Illinois generally disfavor restrictive covenants in the employment context. *See Reed, Roberts Assocs., Inc. v. Strauman*, 353 N.E.2d 590, 593 (N.Y. 1976); *Canfield v. Spear*, 254 N.E.2d 433, 434 (Ill. 1969). Both states will enforce restrictive covenants, however, when they are reasonable and necessary to protect the employer's legitimate business interests. *See BDO Seidman v. Hirschberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999); *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396-97 (Ill. 2011). Duberville does not identify—and the Court cannot find—a fundamental public policy of Illinois that would conflict with New York law on this issue. The Court will therefore apply New York law in evaluating the covenant not to compete.

Under New York law, a covenant not to compete in an employment agreement "is reasonable only if it: (1) is *no greater* than is required for the protection of the *legitimate interest* of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman*, 712 N.E.2d at 1223 (emphasis in original) (citations omitted). This rule is strictly applied "to limit enforcement of broad restraints on competition," and the application of the rule is based on "the particular facts and circumstances giving context to the agreement." *Id.* at 1223-24. Here, there are two legitimate interests at stake for WMG: protection of confidential information and protection of customer relationships acquired at WMG's expense. *See id.* at 1125 ("The employer has a legitimate interest in preventing former employees from exploiting or appropriating

the goodwill of a client or customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment."); *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999) (noting that, under New York law, a restrictive covenant may be necessary to "prevent an employee's release of confidential information regarding the employer's customers"). The first question, then, is whether the confidentiality agreement is no greater than necessary to protect these interests.

Ordinarily, a reviewing court would examine the nature of the employee's employment, the make-up of the industry, or other factors that might give context to an employment agreement. But neither party has provided much evidence that would shed light on the circumstances giving rise to the noncompete provision. Even given the lack of depth in the record, however, it is clear from the plain language of the agreement that the noncompete provision is overbroad. The agreement prohibits Duberville from "hav[ing] *any business dealings whatsoever*, either directly or indirectly through associates with any customer or client of WMG, any direct competitor of WMG or any person or firm with whom you have made contact in connection with your employment with … WMG." Defs.' Exh. F, 2009 Confidentiality and Non-Disclosure Agreement at D 00009 (emphasis added). This language protects more than just client relationships that Duberville developed at WMG's expense. It could prevent Duberville from working with a WMG client with whom he never had contact while working at WMG. *See BDO Seidman*, 712 N.E.2d at 1225 ("Extending the anti-competitive covenant to [the employer's] clients with

whom a relationship with [the employee] did not develop through assignments to perform direct, substantive … services would, therefore, violate the first prong of the common-law rule."). For the same reason, the language also goes beyond protecting the release of confidential client information. The contract could prevent Duberville from working with one of WMG's clients that Duberville never interacted with when working for WMG. Since Duberville would not have worked with that client through his role at WMG, he would not have gained any confidential information about that client from WMG. Nevertheless, he would be prevented from working with or for these companies under the noncompete provision.

Moreover, the prohibition on *any business dealings whatsoever* with any WMG clients or customers, or with any persons with whom Duberville made contact with in connection with his WMG employment, would not only prevent Duberville from doing the work he did at WMG, it would prevent him from dealing with those categories of entities or persons in the nuclear power industry. For example, if Duberville took a job with a competitor or client of WMG performing only finance-related work (*e.g.*, forecasting or creating budgets) or human-resources work, neither of which comprised direct sales jobs, he could run afoul of the noncompete provision. The further restriction that Duberville cannot have business dealings even *indirectly* through associates further broadens the restraint on Duberville's ability to work in the nuclear-power industry. Duberville could not work in one of those non-sales roles even if he did not directly work for one of the barred entities or persons. For example, even if he wanted to provide only non-sales budget

forecasting for a company that was not *itself* a WMG client or customer, he still could not do that if the company did business with one of WMG's clients or customers. So, even if Duberville himself did not service that client's or customer's account, he would still have engaged in a business dealing with a client of WMG indirectly through his associates at his new company. These examples demonstrate that the language of the noncompete provision is far greater than necessary to protect WMG's legitimate interests, and is therefore an unreasonable restraint of trade.

Under New York law, courts have the "power to sever and grant partial enforcement for an overbroad employee restrictive covenant." *BDO Seidman*, 712 N.E.2d at 1226. In determining whether to modify an overbroad covenant not to compete, courts "should conduct a case specific analysis, focusing on the conduct of the employer in imposing the terms of the agreement." *Id.* "If the employer demonstrates an absence of overreaching, coercive use of dominant bargaining power, or other anti-competitive misconduct, but has in good faith sought to protect a legitimate business interest, consistent with reasonable standards of fair dealing, partial enforcement may be justified." *Id.* Here, the absence of a record hurts WMG, which bears the burden to show why (and how) it would be appropriate to modify the overbroad convenant that WMG itself drafted. Without any information on the context or circumstances surrounding the agreement, the Court declines to rewrite the noncompete provision of the agreement. Because the noncompete provision of

the confidentiality agreement is unenforceable, Duberville's motion for summary judgment on breach of the noncompete provision is granted.

## G. Illinois Trade Secrets Act

Defendants allege that Duberville violated the Illinois Trade Secrets Act by wrongfully misappropriating WMG's customer list. Defs.' Answer and Counterclaims ¶¶ 72-80. To be entitled to relief under the ITSA, Defendants must show that they have a protectable trade secret. *See Learning Curve Toys, Inc. v. Playwood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003). ITSA defines "trade secret" as information that "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). Duberville argues that he is entitled to summary judgment on Defendants' ITSA counterclaim because the customer list is not sufficiently secret to be a protectable "trade secret" as defined in the statute and Defendants have not put forth evidence that it was the subject of efforts to maintain its secrecy. Pl.'s Br. at 13-15.

Although customer lists are the type of information that may be protected by the ITSA, *see* 765 ILCS 1065(d), customer lists will not always be sufficiently secret to warrant protection. *See Stampede Tool Warehouse, Inc. v. May*, 651 N.E.2d 209, 215-16 (Ill. App. Ct. 1995); *Multiut Corp. v. Draiman*, 834 N.E.2d 43, 50 (Ill. App. Ct. 2005) ("Customer lists and pricing information have been recognized as trade

secrets, although such determinations have hinged on the facts of a case."). "The key to secrecy is the ease with which information can be readily duplicated without involving considerable time, effort[,] or expense." *Stampede Tool*, 651 N.E.2d at 215; *see also Sys. Dev. Servs., Inc. v. Haarmann*, 907 N.E.2d 63, 74-77 (Ill. App. Ct. 2009). A list that can be recreated by "anyone in the business capable of canvassing or finding a directory, … placing a cold call to that business, and asking specific questions designed to elicit the information [in the list]" is not secret. *Office Mates 5, North Shore, Inc. v. Hazen*, 599 N.E.2d 1072, 1084-85 (Ill. App. Ct. 1992); *see also Delta Medical Sys. v. Mid-America Medical Sys., Inc.*, 772 N.E.2d 768, 780 (Ill. App. Ct. 2002) (noting that this requirement is based on the principle that "in a competitive market, an employee must be entitled to utilize the general knowledge and skills acquired through experience in pursuing his chosen occupation"); *Pope v. Alberto-Culver Co.*, 694 N.E.2d 615, 617 (Ill. App. Ct. 1998) (stating that the secrecy requirement "precludes trade secret protection for information generally known or understood within an industry even if not to the public at large").

The ITSA's definition of trade secret also requires that the owner of the information make reasonable efforts to keep the information secret. 765 ILCS 1065/2(d). In evaluating this requirement, courts often look to the extent to which the information is known by the employees of the owner of the information and the steps that the owner of the information took to protect the list. *See Stampede Tool*, 651 N.E.2d at 215-16; *Learning Curve Toys*, 342 F.3d at 722 (identifying these criteria as two of six common-law factors often applied by Illinois courts in

evaluating trade secrets under the ITSA). For example, employers may limit access to the information to certain employees only, keep the information encrypted, password-protected, or locked, prevent copying of the protected information, or require employees to sign confidentiality agreements. *See Multiut Corp.*, 834 N.E.2d at 50; *Stampede Tool*, 651 N.E.2d at 211-12.

Duberville argues that WMG has failed to establish that its customer list is a protectable trade secret under the ITSA. Pl.'s Br. at 14. He first argues that the customer list is readily ascertainable by anyone working in the nuclear power industry. *Id*; *see also* PSOF ¶¶ 3-4 (stating that Duberville has worked in the nuclear power industry for decades and has developed a substantial network of contacts in the industry). In response, Defendants argue that the customer list is not a list of all companies in the nuclear power industry, "but rather only those individuals within specific power companies with whom WMG has engaged in business and who control purchasing decisions." Defs.' Resp. Br. at 13. Defendants do not include a citation to the record in support of this argument, nor does their statement of facts or response to Duberville's statement of facts appear to contain any reference to the customer lists. Defendants also argue that Duberville's own statement that he spent decades in the industry developing a personal network demonstrates the amount of time and expense that recreating the customer list would require. *Id.* Defendants provide no evidence that Duberville's network of contacts is duplicative of the customer list, and even if it were, Defendants have not

explained why Duberville should be prevented from using customer contacts he generated independently.

Duberville also argues that Defendants have failed to put forth evidence that they took any measures to protect their trade secrets. Pl.'s Br. at 14. Defendants respond that all WMG employees had to sign employment agreements similar to the one that Duberville signed, but again provide no citation to the record to support this argument.[15] Defs.' Resp. Br. at 13. The Court could find no reference in Defendants' statement of facts or their response to Duberville's statement of facts to confidentiality agreements signed by other WMG employees. The only fact in the record before the Court that demonstrates that WMG took any precautions to protect its information is that Duberville signed a confidentiality agreement preventing disclosure of confidential information, which could include customer lists. DSOF ¶¶ 9-11.

"The existence of a trade secret ordinarily is a question of fact." *Learning Curve Toys*, 342 F.3d at 723 (applying the ITSA). The proper inquiry, therefore, is "whether, given the totality of the evidence, [Defendants] presented sufficient evidence from which a reasonable jury could find in [their] favor." *Id.* at 721 (quoting *David v. Caterpillar, Inc.*, 324 F.3d 851, 858 (7th Cir. 2003)). Here, Defendants have presented almost no evidence on the content of the customer lists,

---

[15]In Defendants' Answer to the First Amended Complaint and Counterclaims, they allege that "WMG took reasonable steps to maintain the secrecy of this list by requiring its employees to sign a confidentiality and non-competition agreement." Defs.' Answer and Counterclaims ¶ 76. But at the summary judgment stage, Defendants cannot rely on the unsupported allegations in their counterclaims. *See Shermer v. Illinois Dept. of Transp.*, 171 F.3d 475, 478 (7th Cir. 1999) (citing *Celotex*, 477 U.S. at 325-26).

efforts taken to protect their secrecy, or any other facts from which a reasonable factfinder could conclude that the customer lists are a protectable trade secret. There are no statements of fact or citations to record evidence that shed any light on what is on the customer lists, let alone any facts that would tend to show that the lists meet the ITSA's definition of trade secret. Where, as here, the nonmoving party bears the burden of proof on a particular issue, the moving party may meet its summary judgment burden by showing the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see also Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 979 (7th Cir. 1996) (clarifying that the *Celotex* language did not absolve the movant of his initial burden—the movant must still demonstrate that the nonmovant cannot support an element of the claim). The nonmovant must then "set forth specific facts showing that there is a genuine issue for trial." *Logan*, 96 F.3d at 978. Duberville has pointed out the absence of evidence in the record that would show that customer lists are protectable trade secrets. Defendants did not respond with any record evidence at all, let alone any evidence that would create a dispute of material fact. *See* Defs.' Resp. Br. at 13. Duberville's motion for summary judgment on Defendants' ITSA counterclaim is granted.

## IV. Conclusion

For the reasons discussed above, Defendants' motion for summary judgment on Duberville's Illinois Sales Representative Act and Illinois Wage Payment and Collections Act claims are granted. Although those claims have been dismissed,

Duberville is permitted to proceed on a breach of contract claim based on the same facts. Defendants' motion for summary judgment on Duberville's breach of contract claim is granted in part and denied in part. The motion is granted for all conduct occurring after January 1, 2011. But the record shows a genuine dispute of material fact as to the terms of the employment contract in the final months of 2010. The motion for summary judgment is therefore denied for Duberville's breach of contract claim based on commissions allegedly earned between September 2010 and December 2010.

The parties' motions for summary judgment on Defendants' counterclaims are also granted in part and denied in part. Both parties' motions for summary judgment on the breach of the duty of loyalty claim are denied because the record reflects genuine issues of material fact. Duberville's motion for summary judgment on the fraud claim was premised on the same argument, and it is denied for the same reason. The parties' motions for summary judgment as to the breach of the nondisclosure portion of the Confidentiality Agreement are both denied. Defendants' is denied because there is a genuine dispute of material fact surrounding the disclosure of confidential information; Duberville's is denied because the agreement was supported by consideration. Duberville's motion for summary judgment on the breach of the noncompete portion of the Confidentiality Agreement is granted, because the restrictive covenant is unreasonable and therefore void under New York law. Defendants' motion for summary judgment for breach of the noncompete is therefore denied. Finally, Duberville's motion for

summary judgment on Defendants' Illinois Trade Secrets Act claim is granted, as Defendants failed to present evidence to support its allegation that the customer lists were protectable trade secrets.

The status hearing of January 30, 2015 is accelerated to January 22, 2015, at 9 a.m. The parties shall be prepared to set a trial date, or to state whether they wish to have another settlement-conference referral, which the Court encourages. If the parties decide that they want the referral, they may call the courtroom deputy any time before January 22 to have it entered, and the status hearing will be continued until after the completion of the referral.

ENTERED:

s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: January 13, 2015